681 F.Supp. 981 (1988)
BANCO y AGENCIA de FINANCIAMIENTO de la VIVIENDA de PUERTO RICO, Plaintiff,
v.
URBANIZADORA VILLALBA, et al., Defendants.
BANCO y AGENCIA de FINANCIAMIENTO de la VIVIENDA de PUERTO RICO, Plaintiff,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.
Civ. Nos. 86-0332 (JAF), 86-0487 (JAF).
United States District Court, D. Puerto Rico.
March 18, 1988.
*982 Cancio, Nadal & Rivera, San Juan, P.R., for plaintiff.
Feldstein Gelpi Hernandez & Gotay, San Juan, P.R., for Federal Deposit Ins. Corp.
Maximiliano Trujillo, Bayamón, P.R., for Urbanizadora Villalba.
Francisco A. Rosa Silva, San Juan, P.R., for Trans World Assur. Co.

OPINION AND ORDER
FUSTE, District Judge.
The Banco y Agencia de Financiamiento de la Vivienda de Puerto Rico ("Housing Bank") originally filed these two separate cases in the Superior Court of Puerto Rico, San Juan part, seeking declaratory judgments. The Federal Deposit Insurance Corporation ("FDIC"), one of the several defendants in both actions, timely filed petitions for removal in both. The Housing Bank moves to remand both cases, and the FDIC seeks to dismiss them under Fed.R. Civ.P. 12(b)(6). Because both cases present identical issues of law and very similar issues of fact, they are consolidated for purposes of this opinion and order. For the following reasons, we deny the motions to remand, and grant the motions to dismiss.

I.
The FDIC invokes 12 U.S.C. sec. 1819(4) as a jurisdictional base for removal.[1] The Housing Bank argues that the cases must be remanded because it is an arm of the Commonwealth of Puerto Rico and therefore immune from suit in federal court under the eleventh amendment to the U.S. Constitution.[2] It characterizes both actions as those instituted by the FDIC for the recovery of money from the state.
The eleventh amendment established the principle of sovereign immunity that "the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given." Salkin v. Commonwealth, 408 F.2d 682 (1st Cir.1969); Ex parte State of New York, 256 U.S. 490, 497, 41 S.Ct. 588, 589, 65 L.Ed. 1057 (1921). Thus, it provides immunity to unconsenting states from suits in federal court brought by its own citizens, Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), and from suits brought by citizens of another state, Great Northern Life Insurance Co. v. Read, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944). The general rule is that the suit is against the state if "`the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be `to restrain the Government from acting, or to compel it to act.'" Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100 n. 11, 104 S.Ct. 900, 908 n. 11, 79 L.Ed.2d 67 (1984) (quoting Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963)).
As the above principles illustrate, the eleventh amendment prevents a state from being sued in or brought in federal court as a defendant. It does not bar a suit by a state as a plaintiff in federal *983 court. The Housing Bank commenced the action in Superior Court, and the FDIC removed the case to federal court, but has not counterclaimed for any money. The question is whether FDIC's removal of the case to federal court is for the purposes of the eleventh amendment a suit "commenced or prosecuted" against the Commonwealth. Because we find that the removed case is not one "commenced or prosecuted" against the Housing Bank in federal court, we need not reach the question whether the Housing Bank is an arm of the Commonwealth. Commonwealth of Puerto Rico v. Sea-Land Service, Inc., 349 F.Supp. 964, 976-78 (D.P.R.1970). This is not a suit "brought against" the Housing Bank, nor does it seek to recover money from the Commonwealth treasury. The Housing Bank has mischaracterized the nature of this case. The statute which provided FDIC the jurisdictional basis to remove the action, 12 U.S.C. sec. 1819(4), only provides a different, federal forum to adjudicate the rights of the parties in a case in which the FDIC is a party. Franklin Nat. Bank Sec. Litigation v. Andersen, 532 F.2d 842 (2nd Cir.1976). Removal only gave the FDIC power to substitute the forum in which to adjudicate the rights of the parties. It has not changed the nature of the cause of action. The Housing Bank remains the plaintiff, and the FDIC, as well as the other parties, remain the defendants. The Housing Bank still has the burden of prosecuting the case. Where the case in all other respects is properly removed and the court has no other jurisdictional problems, the Housing Bank will be suing here, instead of suing in local court. Accordingly, the motions to remand the case under the bar of the eleventh amendment are denied.

II.
In passing on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court accepts as true all the material allegations contained in the plaintiff's complaint. Williams v. City of Boston, 784 F.2d 430, 433 (1st Cir.1986); O'Brien v. DiGrazia, 544 F.2d 543, 545 (1st Cir.1976), cert. denied, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). The basis of FDIC's motions to dismiss is that both complaints have alleged neither a case or controversy within the scope of Article III of the U.S. Constitution, nor an actual controversy within the Declaratory Judgment Act, 28 U.S.C. sec. 2201. The complicated nature of the facts which gave rise to the complaints are similar in both cases. At this juncture we find it appropriate to summarize the general allegations of both complaints, and then to summarize the essential allegations of each, as best we are able from the lengthy complaints.
In both cases the Housing Bank insured the preliminary financing that Girod Trust Company ("Girod")[3] provided to sponsors of local public housing projects under the Preliminary Loans for Construction Assurance Program ("Loan Program"). Law 72 of 1976, 7 L.P.R.A. sec. 261. Under the Loan Program, the Housing Bank is authorized to insure a lender's provisional financing provided for the construction of certain housing projects. 7 L.P.R.A. sec. 261. To satisfy potential liabilities to the lenders under the Loan Program, the Housing Bank created the Insured Mortgages Reserve Fund, which is maintained by debenture bonds and premiums and fees derived from insuring these mortgages. Id. The Housing Bank also adopted the Mortgage Security Insurance Regulation ("Insurance Regulation,") which, among other things, establishes the rules and procedures by which the Housing Bank shall provide insurance to lenders. 7 L.P.R.A. sec. 262. A key provision in the statutory scheme is that if the mortgagor of the project defaults, and the lender has complied with all the Housing Bank's requirements in accordance with the Insurance Regulation, the lender will be entitled to payment of the insurance. 7 L.P.R.A. sec. 265.
In civil case No. 86-0487, Girod provided the initial financing to Coamo Developers *984 Corporation ("Coamo Developers") for the construction of a low rent housing project known as the Jardines de Coamo Project ("Coamo Project"). In Civil case No. 86-0332, Girod provided the provisional financing to Urbanizadora Villalba ("Villalba") for the construction of a similar low rent housing project known as the Brisas de Ciales Project ("Ciales Project"). Both projects began in 1978 and 1980, respectively, and both encountered financial and other problems in their construction, which required restructuring of the finance agreements with Girod, and, in turn, restructuring of the Law 72 insurance with the Housing Bank. Girod became insolvent, and FDIC was appointed the receiver of Girod's assets, which included the loans to Villalba and Coamo Developers. Because of their varying problems, both projects became paralyzed and at this date remain dormant.

A. 86-0487: The Coamo Project
In 1978, Girod provided Coamo Developers over $4 Million in initial financing under a Loan and Pledge Agreement ("Loan") to construct the Coamo Project. The Housing Bank under Law 72 insured the project and issued Girod an insurance certificate. Four days after the loan was executed Girod assigned its interest in the loan to the J. Henry Schroeder Bank and Trust Company ("Schroeder"). The Century Builder Corporation ("Century") was the general contractor. The firm of Prann, López, Matos & Associates ("Prann") managed the project. At the request of Coamo Developers, in 1980 Girod increased the initial financing from $4 Million to over $12 Million, and the number of housing units was increased. The Housing Bank subsequently insured this loan and issued its new insurance certificate, and Girod sold 76.2% of the loan to Schroeder. In 1981, Prann issued a progress report, stating that 195 units were finished, 44 were in progress, and 206 were to be built. It cited problems with the Coamo project such as slow deliveries that were increasing the life of the project, and that additional financing was needed to finish the construction. Prann issued a July 1982 progress report stating that lack of personnel, equipment, and materials had paralyzed the project. Girod proposed to the Housing Bank a restructuring of the financing for a second time, but the Housing Bank declined. In 1983, the Housing Bank wrote to Girod stating that Coamo violated the agreement to construct the project, and that it considered Law 72 violated as well. In 1983, Coamo Developers sold the project to both the Colony Construction Corporation ("Colony") and the Urban Development Corporation ("URDECO") in separate deeds of sale, which the Housing Bank alleges resulted in a double sale of a single asset. Colony and URDECO assumed the mortgage contract as the new mortgagees. As a result, Girod claimed from the Housing Bank the insurance benefits under the Law 72 insurance certificate and agreement, and informed that it was ready to transfer titles of the properties in accordance with the Insurance Regulation. Girod later withdrew its claim, and again proposed to restructure the financing. On August 21, 1984, the Housing Bank cancelled the Law 72 insurance alleging that Girod defaulted. Two days later, the FDIC informed the Housing Bank that Girod became insolvent, and that it was appointed the receiver of Girod's assets, which included the loans for the Coamo project. In 1985 FDIC prepared a statement regarding the loan, stating, among other things, that the amount insured by the Housing Bank was $8.5 Million.

B. 86-332: The Ciales Project
Girod provided Villalba over $4 Million under a 1980 Loan and Pledge Agreement for this project, a 159-unit, duplex housing complex. Constructora Archi, Inc. ("Archi") was the general contractor. Engineers Orlando Rey and José Meléndez designed the construction plans. The Housing Bank contracted Prann as Consulting Engineer and auditor. Without authorization from the Housing Bank, Girod approved a change in the construction to provide 28 additional units. By early 1981, the Housing Bank became concerned that the project was progressing slowly. The delays were the result of lack of equipment, non-utilization of heavy equipment, and *985 problems with the off-site design. These and other problems, such as the sanitary system, continued into 1982 and Villalba continued to work on the alternate project. By early 1983, the Housing Bank agreed to insure additional temporary financing to $5 Million, but informed Girod that the insurance did not cover the additional unapproved lots. By letter agreement, Girod agreed to this qualified insurance coverage. By mid-1983, the above construction problems continued, and the Farmers Home Administration, which apparently agreed to finance part of the construction, did not grant the financing. In August 1983, Villalba slowed construction of the entire project and terminated construction of the existing units until the financial and structural problems could be resolved. In 1984, Girod informed the Housing Bank that because the Farmers Home Administration could not grant the commitment, Girod could not either, and requested its assistance. Girod later said that it would provide the additional financing to Villalba if the Housing Bank would insure it. Finally, on August 23, 1984, FDIC informed that it purchased the assets of the insolvent Girod, which included the loan to Villalba insured by the Housing Bank.

C. Requests for Relief
In Civil No. 86-0487, the Housing Bank requests a declaration of the following: whether Law 72 and the Insurance Regulation were complied with to create Housing Bank liability to the insured; whether terms of the loan agreement between Girod and Coamo Developers were complied with; whether the Housing Bank was induced by fraud to enter into the amended guarantee of the preliminary financing; whether the builders or Girod defaulted in not providing sufficient funds to finish the project; whether the insurance the Housing Bank provided under Law 72 was reduced to a bond; whether there was a conflict of interest between several of the parties; whether FDIC, as the receiver of Girod's assets, or Schroeder, possesses the right to claim the insurance benefits under Law 72 and the insurance certificate.
In Civil No. 86-0332, the Housing Bank requests a declaration of similar issues: whether Law 72 and the insurance regulation were complied with in order to create Housing Bank liability to the insured; whether the loan agreement between Girod and Villalba were complied with; whether the Housing Bank was induced by fraud to enter into both the original insurance agreement and the amended agreement; whether the facts as developed will vitiate the agreement to insure the temporary financing.
In both cases, the Housing Bank in essence seeks a declaration that it is not liable to pay the insurance benefits under law 72 to FDIC or any other party. It says there are some twenty other construction projects in similar precarious positions and its potential liability in all these projects may be $90 Million. It requests an advance determination from the court as to whether the insurance guarantee constitutes binding obligations.
The court has concisely simplified the complicated facts in the complaint that led to the paralyzation of these projects. FDIC argues notwithstanding the above facts, neither complaints present a case or controversy within article III of the Constitution and the terms of the Declaratory Judgment Act, 28 U.S.C. sec. 2201, and that the Housing Bank is seeking merely an advisory opinion from the court. To determine whether there exists a justiciable controversy under Article III and whether we can grant declaratory relief, we must decide whether there exists "a live and acute controversy that must be resolved," Steffel v. Thompson, 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974), and whether the case presents "a substantial controversy, between parties having adverse interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Casualty Co. v. Pacific Coal & Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).[4] Moreover, *986 "[n]o matter what type of case, federal courts are not empowered to give plaintiff advisory opinions where there is no actual controversy." Shell Oil Co. v. Noel, 608 F.2d 208, 211 (1st Cir.1979).
FDIC's arguments are well taken. The Housing Bank's real concern is that FDIC, as the receiver of Girod's assets, will claim the insurance benefits under the insurance certificates and Law 72. By obtaining a declaratory judgment, the Housing Bank will preempt FDIC's action. However, FDIC has not commenced any action to claim the benefits. Furthermore, under the statutory and regulatory scheme of the Loan Program, FDIC must take several steps before it may commence any action to recover the insurance benefits from the Housing Bank. Neither party has cited a case claiming the insurance benefits, the holder of the insurance certificate must pursue legal action to foreclose the mortgaged property insured by the Agency, obtain title at the judicial sale, and transfer free and clear title to the Housing Bank. The holder must file with the Housing Bank the claim for benefits within thirty days of either the date he acquired title of the foreclosed property or the date or dates of the award of the judicial sale. The holder must accompany his claim with a report of the debt, which must include the balance of the loan, interest owed, and a breakdown of the expenses and taxes incurred.
Though the court recognizes that the construction projects are at a standstill, because neither FDIC nor any other interested party[5] has claimed the insurance benefits or taken the necessary steps to foreclose on the mortgaged properties, granting the requested relief would be premature. Declaratory relief, which is discretionary, should be denied where "it will not terminate the controversy or serve a useful purpose." Winpisinger v. Watson, 628 F.2d 133, 141 (D.C.Cir.), cert. denied, 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980). Once FDIC takes the necessary steps to foreclose on the mortgaged properties and claim the benefits, then there will exist an "actual controversy" within the meaning of the Declaratory Judgment Act and a "case or controversy" within the scope of Article III. However, at this point there exists no actual controversy between the parties which this court may adjudicate. Shell Oil v. Noel, 608 F.2d at 213.

Conclusion
The motions to remand are DENIED. The motions to dismiss are GRANTED. Judgment will be entered dismissing both complaints for failure to present a justiciable case and controversy.
IT IS SO ORDERED.
NOTES
[1] That section provides in pertinent part that "[FDIC] may, without bond or security, remove any such action, suit, or proceeding from a State court to the United States district court ... by following any procedure for removal now or hereafter in effect ..."
[2] "The judicial power of the United States shall not be construed to extend to any suit or equity, commenced or prosecuted against one of the United States by citizens of another state or by citizens or subjects of any foreign state." U.S. Const. amend. XI. The Commonwealth of Puerto Rico is entitled to the eleventh amendment protections. Paul N. Howard v. Puerto Rico Aqueduct Sewer, 744 F.2d 880, 886 (1st Cir.1984) cert. denied, 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 970 (1985); Ezratty v. Commonwealth of Puerto Rico, 648 F.2d 770, 776 n. 7 (1st Cir.1981).
[3] Girod Trust Company is now a defunct, insolvent trust company. The same was liquidated by the FDIC.
[4] Though of course the Housing Bank requests declaratory judgments under the local rules rather than the Declaratory Judgment Act, the federal standard must apply. Federal law applies to a case in which the FDIC is a part. D'Oench, Duhme & Co. v. Federal Deposit Insurance Corporation, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). Furthermore, a federal "district court is without power to grant declaratory relief unless such a controversy exists." Maryland Casualty Co. v. Pacific Coal and Oil Co., 312 U.S. at 272, 61 S.Ct. at 512.
[5] There may be an issue in Civil No. 86-0487 whether FDIC and/or Schroeder are the holders of the insurance claim.