In the

# United States Court of Appeals
### For the Seventh Circuit

---

No. 04-3571

LAC DU FLAMBEAU BAND OF
LAKE SUPERIOR CHIPPEWA INDIANS,

*Plaintiff-Appellant,*

*v.*

GALE NORTON and UNITED STATES
DEPARTMENT OF THE INTERIOR,

*Defendants-Appellees,*

and

HO-CHUNK NATION,

*Intervenor-Appellee.*

---

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 03 C 588—**Barbara B. Crabb**, *Chief Judge.*

---

ARGUED MARCH 31, 2005—DECIDED SEPTEMBER 1, 2005

---

Before FLAUM, *Chief Judge*, and POSNER and EVANS,
*Circuit Judges.*

FLAUM, *Chief Judge.* The Indian Gaming Regulatory
Act ("IGRA"), 25 U.S.C. §§ 2701-2721, governs gambling
conducted by Indian tribes. The IGRA allows tribes to
operate casinos on their reservations or on lands held in
trust for their benefit by the Secretary of the Interior ("the

Secretary") only if conducted pursuant to an agreement between the tribe and the state where the proposed casino will be located. 25 U.S.C. § 2710(d)(1). The Secretary must independently approve the agreement—known as a "Tribal-State compact"—for gaming under that compact to be lawful. § 2710(d)(1)(C), (d)(3)(B). For several years, the Ho-Chunk Nation has operated a number of casinos pursuant to a compact with Wisconsin. In 2003, Ho-Chunk negotiated a new compact with the State authorizing it to open additional casinos. The amended compact also appears on its face to disadvantage any other tribe who might seek to operate casinos in Wisconsin. The Secretary did not comment on the compact and, because the IGRA equates 45 days of silence with approval, the new agreement took effect by operation of law. *See* § 2710(d)(8)(C).

The Lac du Flambeau Band of Lake Superior Chippewa Indians ("LDF"), another tribe in Wisconsin, filed this suit under the Administrative Procedures Act ("APA") against the Secretary,[1] challenging her decision to permit the amended compact to take effect. After Ho-Chunk intervened, it and the Secretary moved to dismiss the suit. The district court granted their motions, holding that LDF lacked standing and that the Secretary's action was not reviewable under the APA. The court also con- cluded that it was required to dismiss the case because Ho- Chunk was a necessary and indispensable party which, because of its sovereign immunity, could not be joined as a defendant. LDF appeals. For the reasons stated herein, we affirm.

---

[1] LDF's amended complaint names the Secretary and the Department of the Interior as defendants. Because their positions merge in this appeal, we refer to them collectively as the Secretary.

## I.  Background

### A.  The IGRA

Before turning to the pleadings, we briefly outline the IGRA's statutory scheme. The IGRA regulates gaming conducted by Indian tribes on their reservations or on lands held in trust for their benefit by the Secretary. The Act divides all gaming into three classes, regulating each class to varying degrees. 25 U.S.C. §§ 2703(6)-(8), 2710. This case focuses on Class III gaming, the most heavily regulated of the classes, which includes casinos. *Id*. The Act provides that "Class III gaming activities shall be lawful on Indian lands only if such activities are . . . conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect." § 2710(d)(1)(C). A Tribal-State compact "shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary." § 2710(d)(3)(B). Thus, Class III gaming is lawful only if conducted under a compact approved by both the host state and the Secretary.

The IGRA imposes an additional layer of restrictions when a tribe seeks to conduct Class III gaming on lands that are neither within nor contiguous to the boundaries of its reservation. *See* § 2719(a)(1). The Act generally prohibits such "off-reservation" gaming if it would be "conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988." § 2719(a). One exception to this ban holds if:

> the Secretary . . . determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination.

§ 2719(b)(1)(A). Accordingly, the Act contemplates that both the Secretary and the host state will play significant roles in regulating Indian gaming.

## B.  Factual Allegations

Because this is an appeal from a dismissal under Federal Rule of Civil Procedure 12(b), we summarize the facts as alleged by LDF's amended complaint. The Ho-Chunk Nation is a federally recognized tribe residing in Wisconsin. For several years, it has operated a number of casinos in that state pursuant to a Tribal-State compact. In 2003, it negotiated an amendment to the compact with Wisconsin that purports to authorize it to operate a total of nine Class III gaming facilities within the State. This case focuses on ¶ 16 of the final version of those amendments, signed on June 5, 2003. Paragraph 16 provides that if any tribe other than Ho-Chunk submits an application to the Secretary under 25 U.S.C. § 2719(b)(1)(A) to conduct gaming "on off-reservation trust lands acquired by the United States after January 1, 2003," and the Secretary determines that the establishment would be in the best interest of the tribe and not detrimental to the community:

> the State shall send a written notice . . . to [Ho-Chunk] that it has received a submission from the Secretary to concur in the Determination. . . .  [T]he State shall not concur in the Determination if [Ho-Chunk] has notified . . . the State, within sixty (60) days of receipt of the Notice, that the operation of the Establishment will cause a substantial reduction . . . of Class III gaming revenues at any of [Ho-Chunk's] existing gaming facilities, unless the State has entered into a binding indemnification agreement with [Ho-Chunk] to compensate it for the Reduction or the mandatory negotiations required herein have concluded and the

binding arbitration procedures required herein have commenced.

After executing the amended compact, Ho-Chunk and Wisconsin presented it to the Secretary for approval.

LDF is a federally recognized Indian tribe residing in Wisconsin. It currently has an application pending with the Secretary under § 2719(b)(1)(A) to conduct Class III gaming at a site outside its reservation. Outraged at what it perceived to be the anti-competitive nature of ¶ 16, LDF urged the Secretary to reject that agreement. Several other tribes in Wisconsin joined in LDF's protest. Nevertheless, the Secretary took no position on the validity of the amended compact between Ho-Chunk and Wisconsin. The IGRA provides that "[i]f the Secretary does not approve or disapprove a compact before the date that is 45 days after the date on which the compact is submitted to the Secretary for approval, the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of this chapter." § 2710(d)(8)(C). Accordingly, forty-five days after the amended compact was submitted to the Secretary, it was deemed approved by operation of law.

LDF then filed this suit against the Secretary, relying on the APA as the sole basis for subject matter jurisdiction. Plaintiff alleges that the Secretary violated her fiduciary duty to treat all Indian tribes equally by allowing the compact to take effect. Specifically, LDF's amended complaint states that the Secretary exceeded her authority "by granting the Ho-Chunk an affirmative right to be free from economic competition." It seeks as a remedy, among other things, "an order declaring Paragraph 16 void."

Ho-Chunk, which was not named as a defendant, moved to intervene for the limited purpose of seeking to dismiss the suit. The district court concluded that Ho-Chunk had an interest in defending the compact and allowed the interven-

tion. Ho-Chunk and the Secretary then moved to dismiss, and the court granted their motions on three grounds. First, the district court held that LDF had not alleged an actual or imminent injury, and therefore lacked standing to challenge the Secretary's action. It reasoned that one of several contingencies could occur to prevent LDF from being harmed by the anti-competitive provisions of the amended compact. Second, the court held that the APA's grant of judicial review did not extend to the Secretary's passive approval of the compact. Third, it concluded that because LDF sought to invalidate a portion of the compact, Ho-Chunk, as a signatory to that agreement, was a necessary and indispensable party. Because Ho-Chunk enjoys sovereign immunity, however, the district court concluded that it could not be joined as a defendant. Accordingly, the court held that dismissal was required by Federal Rule of Civil Procedure 19(b). LDF appeals.

## II. Discussion

We review the district court's dismissal of LDF's amended complaint de novo. *Centers v. Centennial Mortgage Co.*, 398 F.3d 930, 933 (7th Cir. 2005). "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Appellees argue that dismissal was proper because: (i) LDF lacks standing; (ii) the APA does not afford judicial review of the Secretary's action; and (iii) Ho-Chunk is a necessary and indispensable party which cannot be joined due to its sovereign immunity. As we explain below, LDF has standing to bring this suit. We hold, however, that plaintiff has forfeited any claim that the APA affords judicial review of the Secretary's decision. Accordingly, we do not address whether the suit must be dismissed under Civil Rule 19(b).

**A. Standing**

The requirement of standing derives from the recognition that Article III of the United States Constitution extends the "judicial Power" only to "Cases" and "Controversies." U.S. Const. art. III, § 2. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("[S]tanding imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III."). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id*. "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id*. at 560-61 (internal citations and quotations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id*. at 561. "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id*. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id*. (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

LDF alleges that the Secretary harmed it by allowing the anti-competitive provisions of the Tribal-State compact to take effect. Plaintiff, which currently has an application pending with the Secretary to open a casino outside of its reservation, can do so lawfully only if that application is approved by both the Secretary and Wisconsin. 25 U.S.C. § 2719(b)(1)(A). Plaintiff asserts that by allowing the compact to take effect, the Secretary has given Wisconsin a strong incentive to reject its application. For if Wisconsin approves LDF's application, the compact obliges the State to pay Ho-Chunk for the revenues Ho-Chunk loses to the competing casino. LDF seeks a declaration that ¶ 16 of the compact, the indemnification provision, is void. Appellees argue that LDF's allegations satisfy none of the elements of standing. We consider the elements in turn.

### 1. Injury in Fact

The Secretary argues that LDF lacks standing because it has not adequately pleaded an injury in fact. Defendant asserts that any injury arising out of ¶ 16 of the amended compact is not particular to LDF because it will affect all Indian tribes in Wisconsin other than Ho-Chunk equally.

Defendant's argument is based on a flawed understanding of the particularity requirement. To confer standing, an injury must be "particularized," meaning that it "must affect the plaintiff in a personal and individual way." *Defenders of Wildlife*, 504 U.S. at 560 n.1. In other words, "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Id.* at 573-74. But the particularity requirement does not mean, contrary to the Secretary's interpretation, that a plaintiff

lacks standing merely because it asserts an injury that is shared by many people. *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23-25 (1998). "Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the [Supreme] Court has found 'injury in fact.'" *Id*. at 24. *See also United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 687-88 (1973) ("[S]tanding is not to be denied simply because many people suffer the same injury. . . . To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody."); c*f. Defenders of Wildlife*, 504 U.S. at 572 (finding no standing but distinguishing a hypothetical case "where concrete injury has been suffered by many persons"). LDF alleges that the Secretary's passive approval of the compact places it at a competitive disadvantage when seeking state approval for off-reservation gaming. This clearly amounts to a concrete injury. *See Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (quoting Kenneth Davis & Richard Pierce, Administrative Law Treatise 13-14 (3d ed. 1994)) ("The [Supreme] Court routinely recognizes probable economic injury resulting from [government actions] that alter competitive conditions as sufficient to satisfy the [Article III 'injury-in-fact' requirement]."). That this injury may be shared by other tribes in Wisconsin does not undermine LDF's standing. We therefore reject the Secretary's particularity argument.[2]

---

[2] *Plotkin v. Ryan*, 239 F.3d 882 (7th Cir. 2001), relied upon by the Secretary, does not compel the opposite conclusion. While some language in that opinion might be read as supporting the Secretary's view of the particularity requirement, *Plotkin*

(continued...)

Next, appellees argue that LDF has pleaded an injury that is at most conjectural, not actual or imminent. The Secretary and Ho-Chunk point to a number of contingencies that, as they see it, could prevent LDF from being harmed by the Tribal-State compact. For example, they argue that the compact could harm LDF only if Wisconsin decides to reject plaintiff's application for off-reservation gaming because of the State's duty to indemnify Ho-Chunk under that agreement. Appellees posit that Wisconsin might reject LDF's application for reasons unrelated to the compact, thereby averting the harm to plaintiff.

This argument misperceives the nature of the injury for standing purposes.

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). In

---

[2] (...continued)
did not deviate from the Supreme Court's repeated holdings that a plaintiff does not lack standing merely because he shares an injury with others. A fair reading of *Plotkin* reveals that we rejected standing there not solely because the injury was shared widely, but also because of its speculative nature. *See id*. at 886 ("There are necessarily many outside unknown influences affecting all aspects of these standing concepts advanced by plaintiffs.").

other words, "the 'injury in fact' is the inability to compete on an equal footing." *Id.*; *see also Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978) ("[E]ven if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing. . . . The trial court found [a sufficient injury in fact], apart from the failure to be admitted, in the University's decision not to permit Bakke to compete for all 100 places in the class, simply because of his race."). This analysis, moreover, is not limited to cases alleging a violation of the Equal Protection Clause. The Supreme Court has applied this approach in a case raising a Presentment Clause challenge, *see City of New York*, 524 U.S. at 433 n.22, and we have done the same in a case alleging a First Amendment violation, *see Tarpley v. Jeffers*, 96 F.3d 921, 923 (7th Cir. 1996). Whether to apply this analysis depends on the nature of the alleged injury, not the source of the asserted right. *Cf. Defenders of Wildlife*, 504 U.S. at 576 ("[T]here is absolutely no basis for making the Article III inquiry turn on the source of the asserted right."). Because LDF alleges an injury akin to that raised by the plaintiffs in *Associated General Contractors*—the inability to compete on equal footing—that analysis controls here.

Under that approach, it is clear that a decision by Wisconsin to reject LDF's application for reasons unrelated to the compact would not avert the harm alleged by plaintiff. The harm is not LDF's "inability to obtain the benefit," here, approval of its off-reservation gaming application. Rather, the harm lies in "the denial of equal treatment," in this case, being forced to seek approval under the cloud created by the amended compact. The possibility that Wisconsin might reject LDF's application for legitimate reasons is therefore irrelevant to the standing analysis.

Appellees also argue that the compact is unlikely to harm LDF because there is no guarantee that the Secretary will

approve LDF's application at all, much less anytime soon. Until the Secretary approves that application, defendant and Ho-Chunk assert that a possible rejection by Wisconsin is moot. *See* 25 U.S.C. § 2719(b)(1)(A) (requiring approval of both the Secretary and the host state).

LDF does not argue that the compact between Ho-Chunk and Wisconsin has tainted the Secretary's consideration of plaintiff's pending application. Thus, a denial of LDF's application by the Secretary, unlike a denial by Wisconsin, would prevent LDF from having to compete on an unlevel playing field. Nevertheless, we conclude that on a motion to dismiss, the chance that the Secretary might deny LDF's application does not render plaintiff's injury speculative.

First, we reiterate that "[e]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation." *Defenders of Wildlife*, 504 U.S. at 561. A motion to dismiss for lack of standing should not be granted unless there are no set of facts consistent with the complaint's allegations that could establish standing. *See Hishon*, 467 U.S. at 73. Nothing in the amended complaint is inconsistent with the Secretary's prompt approval of LDF's application. While its pleading is silent on the point, LDF's appellate brief asserts that it filed its application with the Secretary in 2001. *See Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439 (7th Cir. 1994) (when reviewing the grant of a motion to dismiss, "we will consider new factual allegations raised for the first time on appeal provided they are consistent with the complaint."). It is fully consistent with the complaint's allegations to conclude that the Secretary has had ample time to review the application and will approve it shortly.

Second, the present impact of a future though uncertain harm may establish injury in fact for standing purposes.

For example, in *Clinton v. City of New York*, 524 U.S. 417 (1998), the President had exercised a line item veto to cancel a section of the Balanced Budget Act of 1997. If valid, the veto would have subjected the State of New York to potential liability to repay subsidies it had received from the federal government. The legal regime left in place following the veto imposed liability on the State, but vested in the Department of Health and Human Services ("HHS") the discretion to waive that liability. If HHS refused to waive the liability, the State would have required the City of New York, the ultimate recipient of the subsidies, to repay them. The City sued the President, claiming that the exercise of the line item veto violated the Presentment Clause.

The President argued among other things that the City lacked standing to challenge the line item veto because HHS had yet to act on the State's pending waiver request. The Court disagreed: "[t]he State now has a multibillion dollar contingent liability that had been eliminated by . . . the Balanced Budget Act of 1997. . . . [T]he State, and [the City] 'suffered an immediate, concrete injury the moment that the President used the Line Item Veto to cancel'" the relevant section of the Balanced Budget Act. *Id.* at 430 (quoting district court). "The revival of a substantial contingent liability immediately and directly affects the borrowing power, financial strength, and fiscal planning of the potential obligor." *Id.* at 431.

We applied similar reasoning in rejecting a challenge to the plaintiffs' standing in *Alliant Energy Corp. v. Bie*, 277 F.3d 916 (7th Cir. 2002). There, an electric utility and its parent company raised Commerce and Equal Protection Clause challenges to statutes regulating the corporate structure of electric utilities in Wisconsin. *Id.* at 917. One of the contested regulations prohibited electric utility holding companies from selling 10% or more of their stock in a Wisconsin utility to a single person without prior

administrative approval. The parent company's pleadings alleged that it would have sold more than 10% of the subsidiary's stock but for the challenged regulation, but did not identify a potential buyer or the price at which it intended to sell the stock. The district court dismissed the complaint for lack of standing, concluding that these vague allegations pleaded only a conjectural injury.

We reversed, finding it "easy to imagine facts *consistent with* this complaint . . . that will show plaintiffs' standing, and no more is required." *Id.* at 920. We reasoned that the plaintiff could establish a concrete injury even if it were unable to identify any potential buyers of its stock. "The 10% . . . limit[ ] interfere[s] with the competition for capital. An economist would say that [it] deprive[s] the firm of an option value—that is, of the power to sell a 10% bloc . . . in the event that step should prove to be profitable." *Id.* at 921. Moreover, the option to "sell 10% of one's stock . . . has a positive value even if *no one* wants to buy today." *Id.* "A firm with the ability to sell such blocs in the future, when conditions change, is worth more in the market today than a firm hamstrung by laws cutting off its opportunities. This difference in value supplies standing." *Id.*

Likewise, it is easy to conceive of facts consistent with the complaint showing that LDF is harmed by the compact now, even if the Secretary's approval is uncertain. Plaintiff contends that it must court potential investors years in advance to make its planned casino a reality. Recognizing that the compact gives Wisconsin an incentive to reject LDF's application, potential lenders will see LDF's venture as a more risky, and therefore less attractive, investment. LDF will be forced to compensate for this risk by offering a higher rate of return. The increased cost of capital harms LDF now, whether or not the Secretary approves plaintiff's application.

Appellees also postulate that even if the Secretary approves LDF's application, the casino operated pursuant

to that approval might be located far enough from Ho-Chunk's existing casinos that it would not compete with any of them. If so, Wisconsin would have no duty to indemnify Ho-Chunk and therefore no incentive to reject LDF's application unfairly. Or even if LDF's casino might compete with Ho-Chunk's facilities, the Secretary asserts that Ho-Chunk might choose not to exercise its rights under the compact. Alternatively, defendant posits that Wisconsin might elect to indemnify Ho-Chunk against any losses caused by the operation of LDF's competing casino.

None of these possibilities show that LDF has failed to plead an actual or imminent injury. Ho-Chunk admits that it operates six casinos within Wisconsin's borders. The amended compact authorizes Ho-Chunk to open three more, meaning that intervenor may be operating as many as nine facilities in the State by the time LDF presents its application to Wisconsin. Although the amended complaint and its attachments do not plead the precise location of Ho-Chunk's current or planned casinos, the compact requires Ho-Chunk to spread its facilities across six counties. Economic self-interest, moreover, might push Ho-Chunk to avoid clustering its casinos too tightly in any one location to prevent them from competing among themselves. It is therefore possible that Ho-Chunk's network of casinos extends throughout a substantial portion of the State, and that a new LDF casino would compete with one of them. Indeed, Ho-Chunk almost certainly understands this reality, and we therefore find it highly implausible that it would forego its right to be indemnified against lost revenues in the face of a pending application by another tribe.[3] And while Wisconsin might choose to indemnify Ho-Chunk for revenues lost to a competing LDF casino, we find it unlikely that the State

---

[3] We find it telling, moreover, that Ho-Chunk never suggests that it would waive its right to indemnification; only the Secretary presses this argument.

would do so without exacting some concession from LDF. More importantly, none of these contingencies shows that actual or imminent harm to LDF is inconsistent with the pleadings. Nor does our independent review of the amended complaint reveal that LDF has pleaded itself out of court on this element. Accordingly, LDF has sufficiently alleged an injury in fact.

## 2. Causation

Defendant and intervenor also contend that LDF lacks standing because it alleges a harm that was not caused by the Secretary. The causation element of standing demands that the injury be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Defenders of Wildlife*, 504 U.S. at 560-61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). Appellees assert that plaintiff has not met this standard because Wisconsin and Ho-Chunk, not the Secretary, caused any injury suffered by LDF by negotiating the compact. Because neither Wisconsin nor Ho-Chunk are named or could be joined as defendants, appellees assert that plaintiff cannot establish causation.

While the Secretary may not be the only party responsible for the injury alleged here, a plaintiff does not lack standing merely because the defendant is one of several persons who caused the harm. *See Warth*, 422 U.S. at 504-05; *Defenders of Wildlife*, 504 U.S. at 562. That circumstance may make it more difficult, but not impossible, to establish causation. "When . . . a plaintiff's asserted injury arises from the government's" failure to regulate someone other than the plaintiff, causation "ordinarily hinge[s] on the response of the . . . regulable[ ] third party to the government . . . inaction." *Id*. In such a case, causation depends on "choices made by independent actors not before the courts . . . and it

becomes the burden of the plaintiff[ ] to adduce facts showing that those choices have been or will be made in such a manner as to produce causation." *Id.* (internal citations and quotation omitted). LDF easily clears that threshold. In this case, the regulable third parties—Ho-Chunk and Wisconsin— have already made the choices that give rise to the potential harm by negotiating the compact. The Secretary's silent approval caused that potential to become a reality because, but for her approval, the compact would have no effect. *See* 25 U.S.C. § 2710(d)(3)(B).

Next, defendant and intervenor point out that the Secretary never affirmatively ruled on the validity of the compact, meaning that it was approved "only to the extent [it was] consistent with the provisions of" the IGRA. § 2710(d)(8)(C). They argue that nonaction can approve only a lawful compact, and that the Secretary's silence, by definition, could not have harmed LDF.

We disagree. In this instance, the Secretary's silence was the functional equivalent of an affirmative approval. By saying nothing, the Secretary has allowed the parties to the compact to behave as if it were lawful in all respects. Had the Secretary rejected the compact, it would be clear to Ho-Chunk, Wisconsin, and potential investors in LDF's proposed casino that the anti-competitive provisions of the agreement have no legal effect. That § 2710(d)(8)(C) may have prevented the offending provisions from becoming effective in some academic sense is a far cry from an explicit rejection by the Secretary. Because the Secretary's silence enabled the injury, it is fairly traceable to her.

### 3. Redressability

The final challenge to LDF's standing turns on the element of redressability. Redressability "examines the causal connection between the alleged injury and the judicial relief requested." *Allen v. Wright*, 468 U.S. 737, 753

n.19 (1984). On a motion to dismiss, a plaintiff need only plead "that there is a 'substantial likelihood' that the relief requested will redress the injury claimed." *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 75 n.20 (1978).

The relief requested by LDF includes "[a]n order declaring Paragraph 16 void . . . thereby severing it from the Ho-Chunk compact." Ho-Chunk argues that this relief is not a remedy that the IGRA affords and, because it cannot be granted, will not redress the alleged injury. Instead, intervenor contends, the IGRA authorizes the district court at most to remand the case to the Secretary with the instruction that she reconsider whether to approve the compact under the standards set forth in the statute. Ho-Chunk predicts that the Secretary, applying those standards, inevitably would reapprove the compact, affording LDF no relief.

This argument confuses standing with the merits. *See ASARCO Inc. v. Kadish*, 490 U.S. 605, 624 (1989) (quoting *Warth*, 422 U.S. at 500) (standing is a threshold inquiry that "in no way depends upon the merits of the [claim]"). Ho-Chunk's position relies upon one particular interpretation of the IGRA. But "the Article III requirement of remediable injury in fact . . . (except with regard to entirely frivolous claims) has nothing to do with the text of the statute relied upon." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 n.2 (1998). Ho-Chunk does not assert, and we do not conclude, that LDF's position regarding the available remedies is frivolous. Redressability thus depends upon the relief requested, not the relief LDF could prove it was entitled to on the merits. Here, there is a substantial likelihood that the requested relief would alleviate the harm. A judicial declaration voiding ¶ 16 of the amended compact would terminate Wisconsin's duties under that provision. With no duty to indemnify Ho-Chunk, Wisconsin would have no incentive to reject LDF's application un-

fairly. Accordingly, LDF has pleaded a redressable injury, and it has standing to bring this suit.

## B.  Reviewability Under the APA

Generally, the APA confers upon persons "aggrieved by agency action" the right to seek judicial review of that action. 5 U.S.C. § 702. The right of judicial review does not extend, however, to an action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Secretary argues that the IGRA commits to its discretion the decision whether to disapprove a compact, and LDF therefore cannot challenge that decision via the APA. *See* 25 U.S.C. § 2710(d)(8)(B) (providing that the Secretary "*may* disapprove a compact" under certain circumstances) (emphasis added). Because LDF relies on the APA as the sole basis for subject matter jurisdiction in bringing this suit, the Secretary asserts that the case was properly dismissed.

There may be convincing counterarguments to the Secretary's position, but LDF fails to make them. Plaintiff's opening brief does not mention § 701(a)(2); its reply brief states only that the Secretary's argument on this point "is flawed and ignores supporting authority." Neither of LDF's briefs meaningfully address whether the Secretary's action was "committed to agency discretion by law." Moreover, as the party invoking the federal courts' subject matter jurisdiction, LDF bears the burden of establishing that the APA authorizes the district court to entertain this suit. *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 237 (7th Cir. 1995). By not responding to the argument that § 701(a)(2) bars judicial review, LDF has forfeited the point.[4] Because plaintiff has not carried its

---

[4]  Although a jurisdictional *defect* cannot be forfeited, jurisdiction itself may be. *See Crestview Vill. Apartments v. U.S. Dep't of Hous.*

(continued...)

burden of establishing subject matter jurisdiction under the APA, we must affirm the district court's dismissal of the case.

### III.  Conclusion

Although LDF has standing to bring this suit, it has forfeited any argument that the Secretary's actions are reviewable under the APA. Accordingly, we AFFIRM the judgment of the district court dismissing LDF's amended complaint.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*

---

[4] (...continued)

*& Urban Dev.*, 383 F.3d 552, 555 (7th Cir. 2004) (finding that plaintiff forfeited claim of subject matter jurisdiction by failing to argue the point on appeal). The reason for this one-way forfeiture rule is that subject matter jurisdiction defines "the courts' statutory or constitutional *power* to adjudicate the case." *United States v. Cotton*, 535 U.S. 625, 630 (2002) (quoting *Steel Co.*, 523 U.S. at 89). We cannot exceed this power merely because the parties fail to bring to our attention a jurisdictional defect. By contrast, holding that subject matter jurisdiction itself may be forfeited does not entail exceeding the limits of our power; it means only that a party may fail to convince us to exercise it.

---